# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | John W. Darrah | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 3199 | **DATE** | 1/22/2003 |
| **CASE TITLE** | CHARLES M. MCDONALD vs. VILLAGE OF WINNETKA | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Status hearing held. Pretrial conference set for 1/23/03 is stricken. Enter Memorandum Opinion And Order. Defendants' motions for summary judgment as to McDonald's Section 1983 claims are granted. McDonald's state law pendent claim is dismissed without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | JAN 23 2003 | | |
| ✓ | Docketing to mail notices. | | date docketed | 99 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | U.S. DISTRICT COURT | date mailed notice | |
| LG | courtroom deputy's initials | 00 JAN 23 PM 3:01 | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

**DOCKETED**

JAN 2 3 2003

| | |
|---|---|
| CHARLES M. MCDONALD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 00 C 3199 |
| v. | ) |
| | ) Judge John W. Darrah |
| VILLAGE OF WINNETKA, WINNETKA FIRE | ) |
| CHIEF RONALD J. COLPAERT, SCOTT SMITH, | ) |
| and ILLINOIS STATE FIRE MARSHAL SPECIAL | ) |
| AGENT MITCHELL S. KUSHNER, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Charles M. McDonald ("McDonald"), filed suit against Defendants, alleging

deprivation of his civil rights pursuant to 42 U.S.C. § 1983 and a claim of intentional and reckless

infliction of emotional distress pursuant to Illinois law. Before this Court are the Defendants'

Motions for Summary Judgment.

Although the complaint contains two counts, the underlying material facts are myriad and

somewhat complicated. It is appropriate to set out all these operative facts necessarily considered

in support and in defense of the motion before analyzing them pursuant to the applicable law.

## BACKGROUND

*The Fires of May 10 and May 12, 1999*

During the afternoon of May 10, 1999, a fire erupted at McDonald's home at

894 Sunset Road, Winnetka, Illinois. (Def.'s 56.1(a)(3) Statement ¶ A8).[1]  The Winnetka Fire

---

[1]The Village of Winnetka's, Ronald Colpaert's and Scott Smith's Statements of
Uncontested Facts are designated by the prefix"A". Mitchell Kushner's Statements of
Undisputed Facts are designated by the prefix "B".



Department ("WFD") arrived at McDonald's home at approximately 4:09 p.m. (Id., at ¶ A10). Ronald Colpaert ("Colpaert"), the Fire Chief of the Winnetka Village Fire Department, commanded the firefighting efforts at McDonald's home. Scott Smith ("Smith"), the Deputy Fire Chief of the Winnetka Village Fire Department, assisted Colpaert, along with other firefighters from Winnetka and from various surrounding communities. (Id., at ¶¶ A3 - A4, A11).

The May 10th fire started in the sunroom at the east end of the first floor of McDonald's home. (Def.'s 56.1(a)(3) at ¶ A12). All firefighting units ceased firefighting efforts and were released from the scene of the May 10th fire at approximately 8:27 p.m. on May 10, 1999. (Id., at ¶ A13). The May 10th fire was caused by a spark from an electrical outlet that ignited some paint stripping product. (Id., at ¶ A14). Fire, smoke, and heat damaged various rooms on the first and second floors of McDonald's home, including the breakfast nook. (Def.'s 56.1(a)(3) Statement ¶ B12; Plaint.'s 56.1(b)(3)(B) Statement ¶ 89). Neither Colpaert nor Smith conducted the origin and cause investigation of the May 10th fire. (Def.'s 56.1(a)(3) Statement ¶ A15).

At the time of the May 10th fire, McDonald's home contained cellulose insulation that burned and smoldered. Cellulose insulation was present throughout the walls of the attic-level bedroom, the other rooms in the attic, and above the kitchen and breakfast nook ceiling, among other places. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 5). Cellulose insulation can be a cause of rekindles. (Id., at ¶ 6). If not fully extinguished, cellulose insulation can smolder undetected for periods exceeding 2-3 days. Smoldering cellulose can then ignite nearby combustible materials, such as beams or studs. (Id., at ¶ 7).

At approximately 5:08 p.m. on May 12, 1999, the WFD was dispatched to McDonald's home because of another fire. The WFD arrived at the home at approximately 5:09 p.m. (Def.'s 56.1(a)(3)

2

Statement ¶ A17). Colpaert commanded the fire scene at the May 12th fire with Smith's assistance, along with other firefighters from Winnetka and from various surrounding communities. (Id., at ¶ A18). Upon arriving at the scene, the WFD found a large amount of fire had vented itself through the roof toward the center of the structure. (Id., at ¶ A49). The fire was extinguished by approximately 8:50 p.m. (Id., at ¶ A19).

## The Investigation

On May 12, 1999, Colpaert appointed Winnetka Fire Captain Dale Solberg ("Solberg") as the lead investigator of the cause and origin of the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ A22). Because Colpaert wanted a thorough and complete cause and origin investigation, he requested that extra fire investigators from other fire departments report to McDonald's home on May 12, 1999, to conduct a cause and origin investigation. This procedure is known as requesting a "fire investigator box". The State Fire Marshal was also called to conduct a cause and origin investigation. (Id., at ¶ A22). The fire investigator box for the May 12th fire dictated than an investigator from Northbrook, Northfield, and Winnetka participate in the cause and origin investigation of the May 12th fire. These individuals and Mitchell Kushner ("Kushner"), a Special Agent assigned to the Division of Arson Investigation for the Office of the Illinois State Fire Marshal ("OISFM"), arrived at the scene on May 12, 1999. (Id., at ¶¶ A5, A23). Solberg informed Colpaert and Smith of developments in and progress of the investigation. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 24).

Kushner's duties include responding to fires upon the request of local fire departments and to assist fire departments in the investigation of origin and cause of fires. (Def.'s 56.1(a)(3) Statement ¶ B6). He has received extensive training in fire investigation, including investigation into

3

the origins and causes of fires. (Id., at ¶ B7). Kushner is also a trained canine handler. His dog, Nikki, is trained to sniff areas of fire scenes and alert him when accelerants are detected. Nikki assisted Kushner on May 12, 1999. (Id., at ¶ B8). Nikki did not detect any accelerants. (Id., at ¶ B30). Kushner did not have any part in the investigation of the May 10th fire and did not observe the extent of fire damage until after the May 12th fire. (Id., at ¶ B13).

Between 8:50 p.m. of May 12 and 12:35 a.m. of May 13, 1999, Solberg; Kushner; Michael Roeder (Roeder"), Winnetka's other Certified Fire Investigator; Wayne Leucht ("Leucht") and Bernie Arends ("Arends"), investigators from Northbrook; and Tom Burke ("Burke") of Northfield remained at McDonald's home to continue their cause and origin investigations of the May 12th fire. The investigators were assisted by an evidence technician from the Winnetka Police Department, and a photographer from the WFD. (Def.'s 56.1(a)(3) Statement ¶ A24). Neither Colpaert nor Smith conducted the investigation of the cause and origin of the May 12th fire. Colpaert and Smith do not conduct cause and origin investigations of fires. (Id., at ¶ A42).

Solberg first sought to determine the area of the origin of the May 12th fire. He did this by taking the entire scene into consideration, by walking through the remains of McDonald's home, from the least damage to the area of most damage, and by talking with eyewitnesses at the scene. (Def.'s 56.1(a)(3) Statement ¶ A27). Solberg also took into consideration the effect of the May 10th fire. Solberg investigated the May 10th fire and interviewed firefighters who were at the May 10th fire. (Id., at ¶ A28). Before leaving McDonald's home, at approximately 12:35 a.m. on May 13, 1999, Solberg concluded that the origin of the May 12th fire was a stud pocket at the base of the west wall of the breakfast nook, a wall that continues down to the lower-level bar. He formed this conclusion based on fire and burn patterns, firefighting tactics, and witnesses' statements. (Id., at

4

A29). Solberg admitted that the attic area was damaged at least to the same extent as the breakfast nook. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 70).

Kushner also conducted an investigation of the May 12th fire by surveying the entire scene, beginning at the areas of least fire damage and moving toward areas of greatest damage. He also consulted firefighters and investigators who had been on the scene at the May 10th fire in order to differentiate damage caused by the May 10th fire from damage caused by the May 12th fire. (Id., at ¶ A30). Kushner also interviewed Domingo Hernandez ("Hernandez"), a worker at McDonald's home on May 12, 1999. Hernandez stated that he saw smoke and flames coming from the exterior boarded-up window of the breakfast nook. However, in a subsequent declaration, Hernandez avered that he saw flames coming from the southeast corner of the roof over the breakfast nook and that he did not see flames or smoke from the south window of the breakfast nook. (Def.'s 56.1(a)(3) Statement ¶ B21; Plaint.'s Response to ¶ B21).

Kushner, along with other investigators, noted an area of heavy charring and burning in the west wall of the breakfast nook. The wall had no drywall on it and consisted solely of exposed stud beams. Kushner and other investigators focused on this area as a possible point of origin of the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ B23). Kushner was told that the breakfast nook sustained smoke damage in the May 10th fire but did not sustain fire damage. (Id., at ¶ B24). Kushner investigated the breakfast nook's west stud wall and structural members. (Id., at ¶ B25). Kushner examined the area above the stud pocket of the west wall of the breakfast nook by having a light shone on the area above the stud wall. No light was visible from above, indicating to him that no burn material had fallen from another area down into the base of the stud pocket. (Id., at ¶ 27). Samples taken from the home taken to test for accelerants proved negative. (Id., at ¶ B 32). Based

5

on the burn patterns, firefighting tactics, and witnesses statements, Kushner concluded that the May 12th fire originated at the base of the west wall of the breakfast nook and that the fire had spread from the stud pocket of the breakfast nook into the bar area and not vice versa. (Id., at ¶ B26; Def.'s 56.1(a)(3) Statement ¶ A30).

The Northbrook investigator, Burke, also concluded that the possible area of origin of the May 12th fire was in the bar area, the wall which is also the west wall of the breakfast nook. (Def.'s 56.1(a)(3) Statement ¶ A31).

After concluding that the stud bay of the breakfast nook was the point of origin of the May 12th fire, Solberg and Kushner undertook the investigation of the cause of the May 12th fire while still at McDonald's home. Solberg did not make a final cause determination that same evening. Kushner determined that the fire was incendiary while at the house on May 12 - 13, 1999, and indicated such in his report. (Def.'s 56.1(a)(3) Statement ¶¶ A32, A49).

Solberg and Kushner ruled out the possibility that gas, electricity, or lightning caused the May 12th fire. The utilities to McDonald's home had been turned off following the May 10th fire, and the weather service reported that no lightning strikes were in the area on May 12, 1999. (Def.'s 56.1(a)(3) Statement ¶ A34). Solberg and Kushner ruled out the possibility that smoking materials, *i.e.*, cigarettes, caused the May 12th fire because witnesses reported that no one was smoking in the house on May 12, 1999, and because there was no evidence of smoking materials in the area of origin. (Id., at ¶ A35). Solberg and Kushner ruled out the possibility that spontaneous combustion caused the May 12th fire because there was no evidence of spontaneous combustion in the area of the point of origin. (Id., at ¶ A36). Solberg and Kushner ruled out the possibility that a rekindle of the May 10th fire caused the May 12th fire because they concluded that the area of origin of the fire, the

stud pocket at the base of the breakfast nook, was physically remote from the area of the May 10th fire and because there was no burning in the bar areas from the May 10th fire. (Id., at ¶ A37).

Solberg and Kushner also ruled out the possibility that combustible material dropped down into the stud bay area of the breakfast nook to cause the May 12th fire because they concluded that the structural materials above the open stud bay were intact following the May 10th fire and, thus, could not have fallen down. In addition, no remnants of the burned material, such as wood members or insulation, were present in the stud bay following the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ A40). Solberg testified that there "are no other instances in the recent history of Winnetka where a fire occurred at the same scene approximately two days after the first". (Id., at ¶ A43). Burke ruled out a rekindle; it "never entered [his mind]" because of the forty-eight- hour time span between the two fires. (Id., at ¶ A38; Plaint.'s Response to ¶ A38).

A day or two after the May 12th fire, Winnetka police detectives, John Manella ("Manella") and Scott Harty ("Harty"), were assigned to interview witnesses in relation to the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ A44). The detectives interviewed Domingo Hernandez ("Hernandez"), the foreman of a crew of workers who were at McDonald's home on May 12th installing a children's play set in the backyard. The detectives also interviewed Sergeant Kreis, who was the Winnetka Police Department afternoon-shift watch commander on May 12, 1999, and who was present at the fire scene on May 12, 1999; Solberg; Roeder; Smith; Colpaert; Kushner; Brian Funches ("Funches"), the mail carrier on the route that included McDonald's home; Officer Kerner, the first police officer to arrive at McDonald's home on May 12, 1999; Akihiro Mishima, the Winnetka Community Development employee who visited McDonald's home on May 11, 1999, to assess structural damage from the May 10th fire; Steven Strus ("Strus"), the General Adjuster

7

employed by McDonald's insurer, Atlantic Mutual Insurance Company ("Atlantic"); John Agosti ("Agosti"), the fire investigator employed by Probe, Incorporated, hired by Atlantic to investigate the cause and origin of the May 12th fire; Rich Townley, owner of Great Lakes Restoration, the company Atlantic hired to pump water out of McDonald's home following the May 10th fire; Nick Pauls and Jason Pauls, the Great Lakes Restoration employees who were working at McDonald's home on May 12, 1999; Mark Albertairo, a Great Lakes Restoration employee and owner of a gray 1999 Dodge Durango; and McDonald. (Id., at ¶ A45). The detectives' investigation also included reviewing statements from Strus and Tom Robertson and Ray Ridolfi, Wilmette firefighters who visited McDonald's home on May 12, 1999, at approximately 2:30 p.m. (Id., at ¶ A46).

Solberg and the police detectives examined photographs of McDonald's home taken after the May 10th fire but before the May 12th fire and photographs of McDonald's home taken after the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ A47). In addition, samples of materials from McDonald's home were sent to the Illinois State Police lab for testing for the presence of an accelerant because of possible pour patterns near the area of origin. (Id., at ¶ A48; Plaint.'s Response ¶ A48).

During the course of the investigation of the May 12th fire, several additional pertinent facts were determined. In accordance with common practice, a Winnetka firefighter returned to McDonald's home in the evening of May 10, 1999, to inspect the house for "hot spots". One hot spot was found and extinguished. (Def.'s 56.1(a)(3) Statement ¶ A49). Diane Curtis, McDonald's wife, was outside the home on May 11 and 12, 1999, but did not report that she smelled smoke or any burning or smoldering material. Strus met with the insureds at the house on May 11, 1999, at approximately 11:00 a.m. They surveyed both the interior and exterior of the home and did not

8

report seeing any smoke or smelling anything burning or smoldering. Tom Robertson of the WFD was at McDonald's home for several minutes on May 11, 1999, around 2:30 p.m. He viewed the exterior building from the street and did not see any signs of smoke. Various other employees of the Village of Winnetka were at McDonald's home on May 11 and 12, 1999, and did not report seeing or smelling any smoke or any burning or smoldering material. (Id., at ¶ A49).

Nick and Jason Pauls, who were working in the house on the morning of May 12, 1999, did not see any sign of smoke in the house and did not detect any unusual smells that would indicate smoldering materials while they were in the home. Agosti informed Detective Manella that he had ruled out a rekindle and that his report would classify the fire as "incendiary". (Def.'s 56.1(a)(3) Statement ¶ A49).

On May 11, 1999, McDonald met with Strus, his insurance company's adjustor, at McDonald's home to begin the claim process. A disagreement arose between McDonald and Strus regarding the extent of the damage to the house caused by the first fire. McDonald voiced his opinion that the house was a total loss; Strus did not agree. Strus reported to Solberg that McDonald had called him at approximately 3:30 p.m. on May 12, 1999, and that McDonald "was very adamant that the dwelling be considered a total loss". Strus did not agree. (Def.'s 56.1(a)(3) Statement ¶ A49).

McDonald was in his home on May 12, 1999, to let workers in between 9:00 a.m. and 9:30 a.m. He returned at around 11:30 a.m. or 11:45 a.m. and remained in the building until approximately 1:00 p.m. or 1:15 p.m. McDonald did not report seeing any smoke or smelling anything smoldering or burning at that time. At the scene of the May 12th fire, McDonald told Colpaert that he might have seen a wisp of smoke or steam while he was in the building that

9

afternoon. McDonald did not report the claimed smoke or steam at that time because he thought that his mind was playing tricks on him. (Def.'s 56.1(a)(3) Statement ¶ A49; Plaint.'s 56.1(b)(3)(B) Statement ¶ 12). Except for the Winnetka firefighter who detected and extinguished a hot spot the evening of May 10, 1999, no one who had either been in the building or who had viewed the outside of the building between the May 10th fire and the May 12th fire reported seeing, smelling, or otherwise sensing smoke or burning matter in the building prior to the report of the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ A 49).

At the fire scene, McDonald asked Smith what caused the fire. Smith informed McDonald to go see the shift incident commander. (Plaint.'s 56.1(b)(3)(B) Statement ¶¶ 113 - 114, Def.'s Response ¶ 114). McDonald approached Colpaert to ask him what had caused the fire. It was then that McDonald mentioned that he had seen smoke or steam in the attic that day. After McDonald mentioned seeing smoke or steam earlier in the day, Colpaert thought "Dumb ass, why didn't you call us." Colpaert believed that McDonald may have thought the fire was a rekindle. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 20; Def.'s Response to ¶ 20). At the time McDonald asked what caused the fire, Colpaert responded that he did not know. (Id., at ¶ 116). McDonald also followed Solberg and Kushner when they were attempting to interview a witness. Several times they asked McDonald to stop following them; and Solberg told McDonald, that if he did not comply, he would get an officer to detain McDonald. (Id., at ¶ 119).

On May 12, 1999, after the fire, Kushner and Solberg interviewed Hernandez. Hernandez stated that he was working in the back east corner with several other individuals who thought that they smelled smoke. They walked up to the house and saw smoke and fire through the plywood of a boarded-up window in the south window of the breakfast nook area. Hernandez telephoned his

boss, and his boss telephoned the fire department. Solberg believed that this information supported the conclusion that the May 12th fire originated in the stud pocket of the west wall of the breakfast nook. (Def.'s 56.1(a)(3) Statement ¶ A49; Solberg Dep., pp. 32 - 34).

On May 14, 1999, Detectives Harty and Manella also interviewed Hernandez. To his knowledge, McDonald and men pumping water were the only individuals that entered the home on May 12th. It was raining earlier in the day, and there was "steam" rising from the roof as a result of the rain. Hernandez could not provide an exact time of when he first observed smoke coming from the home. At first, he noticed a "thin" smoke and thought it was from steam. Later, he noticed a thicker "white" smoke. He called his boss and asked his boss to call the fire department. Hernandez approximates that a half hour elapsed from the time he observed smoke until the time he called his boss. Hernandez stated that the smoke initially appeared to be coming from the area near the 'pool door' on the 'deck' and then the roof. (Def.'s 56.1(a)(3) Statement ¶ A49; Manella Dep., Exh. 2).

On May 13, 1999, Funches, the mailman, reported that he had observed what he described as a gray Blazer containing a male and two children in the driveway of McDonald's home at about 4:30 p.m. on May 12, 1999, approximately a half hour before the May 12th fire was reported. (Def.'s 56.1(a)(3) Statement ¶ A49).

On May 17, 1999, Kushner met with Solberg. Kushner asked Solberg to contact Strus because Kushner needed certain information from him for his report. Solberg called Strus; and, as mentioned above, Strus informed Solberg that he had a heated conversation with McDonald shortly before the May 12th fire was reported. (Def.'s 56.1(a)(3) Statement ¶ B37). According to Solberg's rendition of his conversation with Strus, McDonald believed that the house was a total loss after the

May 10th fire and should be replaced; Strus believed the house was repairable. (Id., at ¶ B38). Upon Kushner's request, Strus wrote a letter to Solberg relating to his conversation with McDonald on May 12, 1999. (Id., at ¶¶ B39 - B40).

*ATF Involvement*

Also on May 17, 1999. Kushner and Solberg decided to call Glowski of the Bureau of Alcohol, Tobacco and Firearms ("ATF") to relate their findings regarding the cause of the May 12th fire and to suggest that it was something that the ATF might want to look into. (Def.'s 56.1(a)(3) Statement ¶ A57). Calling the ATF for assistance is a standard and common practice for fire investigators. (Def.'s 56.1(a)(3) Statement ¶ B43). Kushner spoke with Glowski about the May 12th fire, briefly summarizing what he found and expressing his conclusions. (Id., at ¶ B44). Kushner told Glowski that he thought the May 12th fire was an arson, and he mentioned McDonald's and Strus's May 12, 1999 conversation. Kushner did not mention any suspects in connection with the fire. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 41). The next day, Glowski met with Solberg, and Solberg provided Glowski the information concerning their investigation. Solberg told Glowski, on both the 17th and the 18th, that the opinions as to the cause and origin were preliminary. (Def.'s 56.1(a)(3) Statement ¶ A58; Glowski Dep., pp. 180-181). Solberg informed Glowski that he did not believe that the May 12th fire was a rekindle and that he believed the fire was incendiary. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 42). Neither Colpaert nor Smith was involved in the decision to call in the ATF. (Dep.'s 56.1(a)(3) Statement ¶ A59). The ATF got involved in the investigation because it was told by Kushner that it was "a possible arson". (Id., at ¶ A60). Solberg testified that he contacted the ATF to tap into their resources and expertise. (Id., at ¶ A61).

McDonald's expert does not criticize Winnetka or the State Fire Marshall for contacting the

ATF under the circumstances present in this case. (Def.'s 56.1(a)(3) Statement ¶ A62). Glowski testified that "if there was misconduct, to me, the last thing they would do is call in a federal agent to come in and review their findings. To me, it seemed like that would be the last course of action you would take if you knew you did something wrong." (Id., at ¶ A63).

On May 25, 1999, when Detective Manella interviewed McDonald, Manella stated that he believed he was asked to investigate the fire because of "government politics". (Plaint.'s 56.1(b)(3)(B) Statement ¶ 36).

Once the ATF was called into the investigation, the ATF determined the scope and nature of its involvement. Solberg provided the ATF with information that he had. The ATF was free to conduct its own cause and origin investigation if it felt it was appropriate. (Def.'s 56.1(a)(3) Statement ¶ A64). Within one or two months of the ATF's involvement, Glowski enlisted Special Agent John Mirocha ("Mirocha"), an ATF cause and origin specialist, to review the cause and origin of the fire. Glowski asked Mirocha to assess Solberg's and Kushner's cause and origin determination and Winnetka's investigation. (Id., at ¶ A65). After reviewing photographs, sketches and plans of the house, and discussing the two fires with Solberg, Mirocha agreed with the cause and origin determination of Solberg and Kushner. (Id., at ¶A66). No one from Winnetka objected to the ATF conducting a cause and origin investigation, and no one told the ATF not to conduct such an investigation. Solberg was "open and forthright" and complied with everything that the ATF asked him. (Id., at ¶ A67). Neither Kushner nor the WFD ever expressed to Glowski any animus toward McDonald or his family. (Def.'s 56.1(a)(3) Statement ¶ B53).

Glowski interviewed McDonald on June 15, 1999. This was the first time that McDonald learned that investigators had determined that the cause of the May 12th fire was incendiary. Glowski

told McDonald that the ATF was involved in investigating the fire only because it was an arson. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 45). Glowski interviewed Diane Curtis ("Diane"), McDonald's wife, on July 1, 1999. During the interview, Diane got the impression that Glowski was suggesting to her that it would be in her and McDonald's best interest to hire a private cause and origin investigator. (Id., at ¶ 46).

During the ATF's investigation, Glowski determined that David Curtis "(Curtis"), McDonald's brother-in-law, owned a gray Blazer and that he was in the area of the May 12th fire at the time the fire began, although he did not work or reside in the area. (Def.'s 56.1(a)(3) Statement ¶ A68). Glowski interviewed Curtis in late June and early July 1999. Curtis appeared to Glowski to be extremely nervous. Glowski served Curtis with a grand jury subpoena; Curtis did not appear before the grand jury. (Id., at ¶ A69).

In mid to late 1999, an Assistant United States Attorney spoke with McDonald's counsel about an investigation by the U.S. Attorney's Office into a possible arson at McDonald's home and into McDonald's possible involvement in the arson. (Reid Schar Declaration).

*Post Incident Analysis*

On June 24, 1999, the WFD conducted a Post-Incident Analysis ("PIA") for the May 10th fire. Smith attended this meeting. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 103). The WFD Standard Operating Procedure ("SOP") # 3.02.01 requires each PIA that is conducted be documented by completing a PIA Fact Sheet, a Post-Incident Worksheet, and a Post Incident Summary. Winnetka's training log for this session reflects that the WFD followed this SOP for the May 10th fire. Winnetka is also required to preserve this documentation so as to provide the WFD with an "analytical record" of the incident. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 105). There is no record of what the firefighters

discussed at this meeting. (Id., at ¶ 106). Colpaert testified that the WFD SOPs are simply guidelines - not requirements. (Def.'s Response to ¶ 105).

Less than a week later, shift commander John Gaughan ("Gaughan") ordered a videotape entitled, "Overhaul: Loss Control." This video discusses "the practice of searching through an extinguished fire scene to find hidden fires that could rekindle". In the following weeks, WFD firefighters who were present at the May 10th fire watched the video - some more than once. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 107).

In October 1999, Solberg wrote the following email to an online community of arson investigators:

> Let me take it one step further. Your department has a fire in a residential structure. Approximately 48 hours after the first fire, a second fire happens. Everyone is starting to think rekindle. Everyone around is thinking the same thing. The structure has a value of over $1,000,000.00. The homeowner says to the Fire Chief, "who is responsible for this, you?" He insinuates that your department could not extinguish the fire right the first time and that you should be responsible for the damage. I called investigators from 4 surrounding communities including the Office of the State Fire Marshal - Division of Fire Investigation. I put in charge an investigator from another community so as not to prejudice the investigation. Their conclusion - the fire was set - not a rekindle. Save face for my department.

(Plaint.'s 56.1(b)(3)(B) Statement ¶ 92).

Solberg admits that he is referring to the May 12th fire in the above email. He also admits that the email contained a misrepresentation; he led the investigation rather than observed it. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 93).

Solberg and Kushner knew that the May 10th fire involved burning insulation. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 108). Winnetka had dealt with other insulation fires. In July 1988,

15

Winnetka extinguished a fire at 9:00 p.m. Winnetka returned to the scene at 3:12 a.m. the following day due to smoldering insulation from the previous fire. In September 1992, a citizen reported the smell of smoke. During its investigation, the WFD found a painter removing paint with a heat gun. After they instructed the painter to remove a portion of the siding on the house, they discovered that there was paper insulation behind the siding. They then told the painter that it would not be a good idea to use a heat gun to remove the paint. In 1995, Winnetka trained its personnel with videos that specifically pertained to attic fires and cellulose insulation. Solberg and Roeder had viewed this tape. (Id., at ¶109)

On January 5, 2000, Winnetka issued a nuisance violation to McDonald, ordering him to demolish his home. Brian Norkus ("Norkus"), the official who issued the nuisance violation, had consulted with the WFD before issuing the nuisance violation. Neither Solberg nor Smith informed Norkus that the ATF might need to get into the house at some point to physically inspect the house in light of the ongoing investigation. (Plaint.'s 56.1(b)(3)(B) ¶ 49).

In March 2000, McDonald's counsel and a private cause and origin investigator made a presentation to the U.S. Attorney's Office, expressing his opinion to the U.S. Attorney and Glowski that the May 12th fire had been a rekindle caused by smoldering cellulose insulation that was not removed after the first fire. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 48). After the presentation to the ATF cause and origin experts went to the scene of the house. The ATF concluded, based upon its examination of the scene, that, while it could not eliminate the possibility of a rekindle, it also could not rule out that the May 12th fire was intentionally set "by someone piling up available combustibles in that stud bay and lighting it". (Def.'s 56.1(a)(3) Statement ¶ A70). The ATF did not conclude that the May 12th fire was a rekindle of the May 10th fire. (Id., at ¶ A71). Nor did the ATF eliminate

arson as a cause of the May 12th fire. (Id., at ¶ A74). The ATF's uncertainty regarding the cause of the May 12th fire was due not to the quality of the previous fire investigation but, at least in part, to the significant alteration of the scene in the months since the May 12th fire. (Id., at A75). Glowski wanted to continue to investigate following the ATF's visit to McDonald's home because the occupants of the gray Blazer seen at the residence half an hour before the May 12th fire had not been identified. (Id., at ¶ A76). The prosecuting Assistant U.S. Attorney telephoned McDonald's counsel that same day and informed him that the investigation would be dropped. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 51).

When the ATF shared its opinion with Solberg and Colpaert, Solberg refused to change Winnetka's NFIRS report to reflect that the cause of the May 12th fire was not incendiary. Colpaert ordered him to do so, but Solberg refused to sign it. Instead, he took the new report and slammed it down in front of Colpaert. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 102).

Colpaert and Smith did not know McDonald before the May 10th fire. On May 13, 1999, McDonald and his wife contacted the WFD to ask for assistance in disassembling a baby crib. Smith went to McDonald's residence and helped take a crib apart. (Def.'s 56.1(a)(3) Statement ¶ 77).

On May 20, 1999, the newspaper, Winnetka Talk, quoted Smith as saying, "It's not a rekindle. Rekindles don't happen 49 hours after the first fire." At his deposition, Smith testified that when he spoke with the reporter about rekindles not happening forty-eight hours after the first fire, he was speaking generally and not specifically about the May 12th fire. (Def.'s 56.1(a)(3) Statement ¶ A78; Smith's Dep., pp. 104-09).

In the experience of Smith, Solberg, and Kushner, no structure had rekindled after the extinguishment of a fire at the same location approximately forty-eight hours earlier. Glowski also

had never heard of a rekindle that took place forty-eight hours after the first fire. (Def.'s 56.1(a)(3) Statement ¶ A51). Solberg, Kushner, and Agosti concluded that the May 12th fire was incendiary. (Id., at ¶ 52). Burke considered the May 12th fire suspicious. (Id., at ¶ 53). There is no evidence that Colpaert knew that Solberg's conclusion regarding the cause and origin of the fire was wrong. (Id., at ¶ 54).

As the Chief of the Department, Colpaert periodically received updates regarding the investigation of the May 12th fire. However, he did not conduct the investigation or direct its course. (Def.'s 56.1(a)(3) Statement ¶ 56). Colpaert reports to the Winnetka Village Manager on fire-related issues. The Village Manager has been on the scene of fires, and Colpaert has "had to answer" to the Village Manager on how the WFD has responded to fires. (Id., at ¶ 56). Solberg did not create a report in connection with his investigation other than the appropriate NFIRS Report of the May 12th fire. Instead, he relied upon Kushner's report as well as other materials, such as photographs. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 87; Def.'s Responses ¶ 87). Kushner's report does not mention rekindle or provide an analysis as to how he ruled it out. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 88).

In February and March 2000, workers that were at McDonald's home on May 12, 1999, prepared declarations concerning their observations of May 12, 1999. Javier Echevarria declared that at approximately 4:00 p.m. on May 12, 1999, he observed smoke coming from the roof of the house. About five minutes later, he observed smoke and flames coming from the southeast corner of the roof. He also observed that the only vehicles in the driveway were a flatbed truck, pickup truck, cement mixer, and a van. He did not see a silver or gray Blazer at the home on May 12, 1999. (Plaint.'s 56.1(b)(3)(B) Statement ¶¶ 13-14; Echevarria Declaration). Antonio Ruiz also observed smoke coming from the roof of McDonald's home, and he did not see flames coming from the area

near the south wall. (Plaint.'s 56.1(b)(3)(B) Statement ¶¶ 13-14; Ruiz Declaration).

## Cause of Origin Procedures

There are three broad categories of a fire's cause: accidental, incendiary, and undetermined. (Def.'s 56.1(a)(3) Statement A33). People in the area of smoldering cellulose insulation may hear crackling, sometimes see a thin layer of smoke, and often smell an unusual odor. (Id., at ¶ A50). It is not all uncommon for local fire departments to write a preliminary report that a fire is incendiary and that the local fire department will call in the ATF; and, in some cases, the ATF may reach a different conclusion as to the cause and origin of the fire. (Def.'s 56.1(a)(3) Statement ¶ B46).

The WFD SOP in effect at the time of the fires provided: "It is the policy of the Winnetka Fire Department to determine the origin and cause of all fires occurring within the jurisdiction of the Village of Winnetka Fire Department." (Def.'s 56.1(a)(3) Statement ¶ A21). The same SOP requires that the fire investigator "[p]repare the necessary forms, sketches and report to record the facts determined by his investigation." (SOP 401). A "Fire Investigation Report" is not the same thing as a NFIRS report. Colpaert believed that Solberg had a completed a Fire Investigation Report and that Solberg was "supposed to" have completed one. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 124). However, Solberg did not prepare a Fire Investigation Report for the May 12th fire. He did not prepare a report because he intended to rely on Kushner's report and did not have time to prepare a report. (Id., at ¶ 127). Solberg prepared a Fire Investigation Report for the May 10th fire after the May 12th fire. (Id., at ¶ 129). Kushner testified that Solberg stated that he intended to prepare a Fire Investigation Report for the May 12th fire. (Id., at ¶ 128).

Generally, the first step in a fire investigation is to determine the area of origin of a fire. (Plaint.'s 56.1(a)(3) Statement ¶ 65). There are several methods that fire investigators use to identify

19

an area of origin. First, fire investigators walk through the scene, starting from the areas of least damage to the areas of greatest damage. The areas of greatest damage often will be the area of origin. Second, fire investigators interview witnesses who saw the fire at its incipient stage. (Id., at ¶ 66).

Once the area of origin is determined, then the specific location of origin can be identified. The specific origin will be where the heat ignited the first fuel and commonly is referred to as the point of origin. The damage created by flame, radiation, hot gases, and smoke creates patterns that investigators use to locate a point of origin. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 67). The shape of the plume of rising hot gases above a burning item can be described as a "V" with its vertex directed at the source of heat. This is called a "V" pattern. Often, fire investigators will look for a "V" pattern in locating the point of origin of a fire. (Id., at ¶ 68).

McDonald's expert, Kim May ("May"), testified that "[t]he circumstances of every fire are different from every other fire because of differences in the structure, fuel loads, ignition factors, airflow, ventilation, and many other variable factors." Plaintiff's expert, Alan DeLee ("DeLee"), also testified that "each fire is different" because of the "many variables" involved. Glowski and John Malooly ("Malooly"), from the ATF, and Solberg testified that every fire and every fire investigation is different. (Def.'s 56.1(a)(3) Statement ¶ A25). The National Fire Protection Association 921 Guide for Fire and Explosion Investigation ("NFPA 921") states that "every fire and explosion incident is in some way different and unique from any other". (Id., at ¶ A26).

Winnetka's expert testified that although each fire incident is in some way different or unique from another, the methodology for determining the origin and cause of each fire is the same. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 52). The expert has written, "Fireman and investigators ... should be extremely careful about attributing the fire to any cause whatsoever unless they have

20

corroboration and are absolutely sure of the cause." He has further explained that "[t]o properly and effectively establish the one and only true cause, the investigator must examine, evaluate, and rule out all other possible causes." (Plaint.'s 56.1(b)(3)(B) Statement ¶ 53). He also explained that there is "no presumption that a fire has been intentionally set. On the contrary, the presumption of innocence which belongs to the accused carries with it a presumption that the fire is of accidental or providential origin." (Plaint.'s 56.1(b)93)(B) Statement ¶ 54).

Investigators should rule out all possible accidental causes of a fire before concluding that it is incendiary. (Plaint.'s 56.1(a)(3) Statement ¶ 56; Def.'s Responses ¶ 56). One of the textbooks in WFD's library warns, "[i]f doubt exists about the cause of a fire, an investigator must rule out all possibilities of accidental fires before drawing conclusions, forming opinions, or proceeding with an arson investigation and trying to determine an incendiary cause." (Plaint.'s 56.1(b)(3)(B) Statement ¶ 57).

When Solberg and Roeder have investigated a residential, structural fire in Winnetka, they have eliminated all accidental causes before making an incendiary determination and found affirmative evidence of arson before they made an incendiary determination. Kushner followed these same procedures. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 61; Def.'s Responses to ¶ 61). Solberg admitted that the fact that a rekindle occurs approximately two days after the first fire does not enable an investigator to rule out a rekindle. (Id., at ¶ 90).

Kushner had a close relationship with Solberg. Solberg and other investigators are "like brothers", a "brotherhood", "more like a family". (Plaint.'s 56.1(b)(3)(B) Statement ¶ 97).

The Office of the State Fire Marshal ("OSFM") requires that its investigators complete a single-page initiation form that is intended to provide the basic information about the time, date,

location, and cause of the fire incident. After the form is completed, the investigator provides a copy of the form to the OSFM. (Plaint.'s 56.1(b)(3)(B) Statement ¶120). On May 13, 1999, Kushner began the process of completing an initiation form for the May 12th fire. He completed the form on or about May 17, 1999. (Id., at ¶ 121). Kushner does not possess a copy of the form, and he did not produce a copy in response to McDonald's document request. The OSFM does not possess a copy of the form and does not have a record of ever receiving a copy of the form. (Id., at ¶ 122).

Under Illinois law, fire departments are obligated to report all fire incidents to the OSFM. The NFIRS reporting system is used to meet this obligation. During 1999 and 2000, Winnetka created its NFIRS reports on computers. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 130). Under Winnetka's computerized system, the reporting officer completed the report, then printed a hard copy of the report, signed it, and filed it with Winnetka's records. Then, on a monthly basis, Winnetka typically transmitted all of the month's NFIRS Incident reports on a computer disc to the OSFM. When Winnetka made these transmittals to the OSFM, it did not send hard copies. (Id., at ¶ 131).

The NFIRS incident report for the May 12th fire, dated May 13, 1999, was completed and signed by Solberg. Colpaert is identified as the officer in charge. The report lists the "Ignition" factor as "Incendiary" and the "Type of Action Taken" as "Investigation Only". (Plaint.'s 56.1(b)(3)(B) Statement ¶ 132). Although the NFIRS handbook calls for the "Officer in Charge" section of the document to bear the date that the officer creates the report, Solberg did not sign the report on May 13, 1999; and he could not recall when he created this report. The date of the report does not change if the report is corrected or updated. (Id., at ¶ 133; Def.'s Response ¶ 133).

A record of Winnetka's electronic transmittal of its NFIRS report for the May 12th fire, obtained from the OSFM, indicates that the WFD transmitted a document in June 1999. This

22

version of the report lists the "Type of Action Taken" by the WFD as "Investigation Only" rather than "Extinguishment", as is found in two hard copies of the report. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 134). McDonald has obtained three versions of the NFIRS report. All three versions are marked as changed reports via a mark in the "Change" field. Whenever a subsequent version of a report is created and the original report is changed in some manner, the "Change" field is automatically marked. (Id., at ¶ 135). The WFD prepares NFIRS incident reports for each fire to which it responds. The WFD has not produced a printed report containing the first, uncorrected version of the NFIRS data entered for the May 12th fire. (Id., at ¶ 123).

A NFIRS report for the May 12th fire was also prepared by the City of Highwood ("Highwood"). Highwood responded to the May 12th fire after Winnetka asked for other municipalities to assist. Highwood was not dispatched to the fire scene. Instead, Highwood was dispatched to the WFD fire station for station coverage. Highwood's NFIRS report lists the cause of fire as a rekindle. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 137). On June 13, 2000, McDonald issued a Freedom of Information Act request to Highwood. In response, Highwood produced an NFIRS report for the May 12th fire that was dated May 12, 1999, was not marked changed, and indicated that the report was completed by Scott Olsen ("Olsen"). This version did not include a cause determination. (Id., at ¶ 138). A copy of the report was faxed to Colpaert prior to McDonald's receiving the report. (Id., at ¶ 140). Later, on August 5, 2000, McDonald issued a subpoena to Highwood seeking the same information. Highwood produced a different version of the report of the May 12th fire. This version was also completed by Olsen and was not marked changed. However, the report listed the ignition factor as a rekindle. (Id., at ¶ 139).

Highwood Chief Ron Pieri ("Pieri") changed the original report because it was erroneous

23

because it did not correctly reflect Highwood's role in the May 12th fire. Olsen testified that he was in the kitchen of the WFD when he had a conversation with an unidentified Winnetka dispatcher. Based on the brief conversation with the dispatcher, Olsen prepared the report and marked rekindle as the cause of the May 12th fire. When Pieri changed the report, he did not explain to Olsen that he was going to change the report, did not mark the change field, did not change the date, and did not put his name on the new version. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 141; Def.'s Response ¶ 141).

Colpaert is responsible for approving the WFD's SOPs. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 145). Colpaert was familiar with SOP # 401.1, which provides, in part, that: "No employee of the Village of Winnetka shall release any information of any incident under investigation to the press or other agency or individuals without the expressed permission of the Fire Chief and the Origin and Cause Investigation Team ... Interested parties who seek information ... of an incident under investigation should be referred to the Origin/Cause Investigation Team." (Plaint.'s 56.1(b)(3)(B) Statement ¶ 147; Def.'s Response ¶ 147). As the Fire Chief, Colpaert is ultimately responsible for ensuring that fires in Winnetka are investigated. However, Colpaert does not do investigations. Colpaert is also the final decision maker whether a fire investigation should cease. (Id., at ¶ 149).

Winnetka's cause and origin investigators report their determinations to Colpaert and Smith. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 150; Def.'s Response ¶ 150). Colpaert reports to the Village Manager who has been at the scene of a fire. Colpaert has had to answer to the Village Manager on how the WFD has responded to fires. (Id., at ¶ 151). The Village Manager relies upon Colpaert's experience and expertise in making decisions related to fire-related matters. (Plaint.'s 56.1(b)(3)(B)B Statement ¶ 152).

At the May 12th fire, Colpaert delegated responsibility for the investigation to Solberg.

24

Colpaert testified that because he is not knowledgeable as to how to conduct a cause and origin investigation, he must rely on his cause and origin investigators to conduct the technical aspects of a fire investigation. (Plaint.'s 56.1(b)(3)(B) Statement ¶ 155).

## ANALYSIS

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). All the evidence and the reasonable inferences that may be drawn from the evidence are viewed in the light most favorable to the nonmovant. *Miller v. American Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000). Summary judgment may be granted when no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Count I of McDonald's amended complaint alleges a violation of 42 U.S.C. § 1983. It alleges that Defendants, while acting under the color of state law, treated McDonald differently than other Village residents whose homes and businesses have experienced fires. McDonald alleges that the "differential treatment was motivated by an illegitimate animus – it was a spiteful effort to 'get' him."

The Supreme Court has held that an equal protection claim may be brought by a person who is a member of a "'class of one' where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*Olech*); *see also Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000) (*Hilton*).

A plaintiff claiming an equal protection violation in a "class of one" case must establish two

elements. First, he must allege that he was singled out for differential treatment. *Olech*, 528 U.S. at 565. The differential treatment can consist of being treated worse than others who were similarly situated, being treated the same as or worse than others who are situated worse than the plaintiff, or being treated differently than some established norm. *See Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995) (*Esmail*). Second, the plaintiff must allege that the differential treatment was irrational or arbitrary. *Olech*, 528 U.S. at 565. In other words, the cause of the differential treatment must be a "totally illegitimate animus toward the plaintiff by the defendant." *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (citation omitted) (*Albiero*).

As to the individual defendants, an individual cannot be held liable in a § 1983 action unless he participated or caused the alleged constitutional deprivation. *Moore v. Sate of Indiana*, 999 F.2d 1125, 1129 (7th Cir. 1993). An official meets this "personal involvement" requirement if he acts or fails to act with reckless or deliberate disregard of the plaintiff's constitutional rights or if the conduct that caused the constitutional deprivation occurs at his direction or with his knowledge and consent. *See Black v. Lane*, 22 F.3d 1096, 1401 (7th Cir. 1994).

Colpaert and Smith first argue that they did not participate or cause McDonald's alleged constitutional deprivation.

The undisputed facts show that neither Colpaert nor Smith conducted the origin and cause investigation. Instead, Colpaert appointed Solberg to be the lead investigator and requested other cause and origin investigators from other fire departments to assure a thorough and complete investigation. Solberg did periodically inform Colpaert and Smith about the ongoing investigation, and they were present during some of the meetings with investigators and the ATF. Immediately after the May 12th fire, Colpaert told McDonald that he did not know what caused the second fire.

26

Furthermore, Colpaert and Smith were not involved in the decision to call in the ATF or Solberg's and Kushner's determinations that the fire was incendiary.

McDonald asserts that evidence of Colpaert's and Smith's involvement includes their participation in meetings, public statements, and communications about the investigation demonstrate sufficient personal involvement by Colpaert and Smith. McDonald's argument is not persuasive and is not supported by the facts.

Colpaert's and Smith's involvement in meetings and communications about the investigation were part of their responsibility as Fire Chief and Deputy Fire Chief. McDonald fails to identify any evidence from any of these meetings or communications that show Colpaert and Smith acted or failed to act with reckless or deliberate disregard to McDonald's constitutional rights or that the alleged constitutional deprivation occurred at their direction or with their knowledge and consent. In addition, Smith's statement to the press was not in relation to the May 12th fire but was addressing a question about rekindles in general.

Furthermore, McDonald's assertion that Colpaert and Smith knew that the May 12th fire was a rekindle based on Solberg's October 1999 email is meritless. McDonald has not presented any evidence of the source for Solberg's purported knowledge of what *everyone* was thinking on May 12th and the content of the email is contrary to McDonald's own undisputed material fact that Colpaert told McDonald that he did not know the cause of the fire when he spoke with him on May 12th.

Based on the above, McDonald has failed to demonstrate that Colpaert and Smith participated or caused the alleged constitutional deprivation.

As to the Winnetka Defendant, because Colpaert, the alleged policymaker, did not participate

or cause the alleged constitutional deprivation, Winnetka cannot be liable. *See Proffitt v. Ridgway,* 279 F.3d 503, 507 (7th Cir. 2002); *Treece v. Hochstetler,* 168 F.3d 360, 364 (7th Cir. 2000). Furthermore, McDonald's allegation that Colpaert and/or Solberg[2] deviated from Winnetka policy when investigating the May 12th fire compared to every other fire investigation for the past twenty years defeats his claim against Winnetka. If a policymaker acts outside the rules, he does not set new policy. Instead, he violates and frustrates the government's policy; and Section 1983 liability will not lie with the municipality for the policymaker's actions. *See Taylor v. Carmouche,* 214 F.3d 788, 791 (7th Cir. 2000); *Auriemma v. Rice,* 957 F.2d 397, 400 (7th Cir. 1992); *McGreal v. Ostrov,* 2002 WL 1784461 (N.D. Ill. Aug. 1, 2002). Accordingly, even assuming that Colpaert had deprived McDonald of a constitutional right by investigating the May 12th fire differently than all of the other fires in Winnetka, liability could still not be found.

All Defendants also argue that McDonald's "class of one" claim fails because he has failed to demonstrate that the alleged differential treatment was based on a "totally illegitimate animus toward" him. *See Albiero,* 246 F.3d at 932.

McDonald does identify any personal animus by any of the Defendants against him. McDonald concedes that none of the Defendants knew him prior to the fires and that following the May 12th fire, McDonald asked the WFD for assistance in dismantling a baby crib and that Smith

---

[2]McDonald also argues that if Winnetka's misdeeds are attributable to Solberg and not Colpaert, Winnetka is still liable because Colpaert delegated authority to Solberg and ratified his actions. However, "delegation" under *Monell* liability is delegation of final policymaking authority, not the authority to make final, even unreviewed decisions. *See Gernetzke v. Kenosha Unified Sch. Dist. No. 1,* 274 F.3d 464, 469 (7th Cir. 2001). The undisputed facts show that Colpaert did not delegate final policymaking authority to Solberg. Furthermore, Colpaert's act of deferring to Solberg's decisions do not constitute ratification. *See Simmons v. Chicago Board of Educ.,* 2000 WL 1720958 (N.D. Ill. Nov. 16, 2000).

went to McDonald's home and assisted McDonald and his wife. Furthermore, Colpaert, Solberg, and Kushner called in additional fire investigators and the ATF to help assure an impartial and complete investigation.

Instead, McDonald relies heavily on Solberg's October 1999 email, which McDonald alleges demonstrates that the Defendants investigated the May 12th fire different than all other fires because they feared that McDonald would file suit against the WFD and/or WFD's reputation would be injured. However, as stated above, McDonald has not presented any evidence of the source for Solberg's purported knowledge of what *everyone* was thinking on May 12th; Solberg's beliefs cannot be reasonably imputed to the other Defendants. McDonald's interpretation of the email, as constituting worry over a possible suit against the WFD and the WFD's reputation, is strained, to say the least, and directly contrary to the undisputed facts set forth above. Furthermore, none of the other independent organizations, including the ATF, the State Fire Marshal, or the other fire departments involved in the fires, has criticized Winnetka's conduct and professionalism during the fires or the investigations.

Based on the above, McDonald has failed to establish that the Defendants' actions were based on a "totally illegitimate animus toward" him; and his claim must fail.

The individual Defendants also argue that they are entitled to qualified immunity.

If a public official raises the defense of qualified immunity, the plaintiff bears the burden of showing: (1) whether he has asserted a violation of a constitutional right and (2) whether the applicable constitutional standards were clearly established at the time the alleged violation occurred. *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) (*Jacobs*). If the rights were not clearly established at the time of the violation, the official is immune from suit, and the claim may be

dismissed. *Jacobs*, 215 F.3d at 766.

A clearly established right is established if the plaintiff can demonstrate that "the contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (*Anderson*). "This is not to say that an official action is protected by qualified immunity unless the very action in question has been held unlawful ... but is to say that in light of the pre-existing law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 639-40.

The so-called "class of one" equal protection claims are cases "in which a governmental body treated individuals differently who were identically situated in all respects rationally related to the government's mission," *Indiana State Teacher's Ass'n v. Board of School Commissioners*, 101 F.3d 1179, 1181 (7th Cir. 1996). Such claims have been recognized in this circuit since at least 1995. *See Esmail*, 53 F.3d at 179. However, McDonald has failed to demonstrate that the Defendants would understand that their conduct violated McDonald's equal protection rights.

The undisputed facts show that the Defendants contacted the ATF to aid in the investigation of the second fire because evidence existed that the fire may have been an arson. No one, including McDonald's expert, asserts that calling in the ATF is unusual. While the May 12th fire may also have been a rekindle, substantial evidence also supported a conclusion that the fire was incendiary. This evidence included the testimony of witnesses at the scene immediately after the fire, particularly as to the apparent location of the origin of the second fire, the fact that the Defendants had never known of a rekindle forty-eight hours after the first fire, and the information relayed by McDonald's insurance company. Moreover, no agency that investigated the May 12th fire concluded that the fire was a rekindle. McDonald has failed to present evidence that a reasonable official would understand

30

that calling in the ATF and making the conclusion that the May 12th fire was incendiary, based on the evidence that existed at the time, constituted a violation of McDonald's equal protection rights. Accordingly, the individual Defendants are entitled to qualified immunity.

Defendants also seek summary judgment on McDonald's claim for intentional infliction of emotional distress (IIED). Based on the above, summary judgment is granted on McDonald's sole federal claim. Accordingly, McDonald's pendent state law claim is dismissed without prejudice. *See* 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1996); *Wright v. Associated Ins. Co.*, 29 F.3d 1244, 1252 (7th Cir. 1994).

## CONCLUSION

For the reasons stated above, Defendants' Motions for Summary Judgment as to McDonald's Section 1983 claims are granted. McDonald's state law pendent claim is dismissed without prejudice.

Dated: January 22, 2003

JOHN W. DARRAH
United States District Judge